UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MALKETA R. SMITH,

     Plaintiff                         Civil Action No. 13-11610

v.                                 HON. THOMAS L. LUDINGTON
                                        U.S. District Judge
                                        HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Malketa R. Smith brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's motion for summary judgment be DENIED and that Plaintiff's motion for summary judgment be GRANTED to the extent that the case be remanded for further administrative proceedings.

## PROCEDURAL HISTORY

On June 8, 2010, Plaintiff filed applications for Disability Insurance Benefits ("DIB") (Tr. 156-157)  and Supplemental Security Income ("SSI") (158-161) alleging disability as

of June 1, 2010 (Tr. 156).  After the initial denial of the claim, Plaintiff filed a timely request for an administrative hearing, held on October 12, 2011 in Flint, Michigan before Administrative Law Judge ("ALJ") Peter N. Dowd[1]   (Tr. 30).  Plaintiff, represented by attorney Frank Cusmano, testified, as did Vocational Expert ("VE") Timothy Shaner (Tr. 36-60, 61-68).  On October 21, 2011, ALJ Dowd found that Plaintiff was not disabled (Tr. 25).  On February 4, 2013, the Appeals Council denied review (Tr. 1-5).  Plaintiff filed for judicial review of the final decision on April 10, 2013.

## **BACKGROUND FACTS**

Plaintiff, born February 8, 1977, was 34 when the ALJ issued the decision (Tr. 25, 156).  She completed high school and worked previously as a cashier and driver (Tr. 173).  She alleges disability as a result of multiple sclerosis ("MS") and depression (Tr. 172).

### A.    **Plaintiff's Testimony**

 *The ALJ prefaced Plaintiff's testimony by noting that she had previously been found to be not disabled through September 4, 2009* (Tr. 33).

Plaintiff then offered the following testimony:

She currently lived in Flint, Michigan with her two sons, aged 13 and 10 (Tr. 37).  She completed the equivalent of a year of college courses but had not obtained a degree (Tr. 37).  She also attended cosmetology school and received a certificate of completion (Tr. 38).

---

[1]An earlier claim for benefits was denied by ALJ Troy M. Patterson on September 4, 2009 (Tr. 14).

In 1997 and 1998, she worked as a housekeeper at a sports stadium (Tr. 39).  In 1999 and 2000 she worked as a cashier at K-Mart and between 2000 and 2003, she worked for Genesee County Transportation Authority as a van driver (Tr. 39).  Her responsibilities entailed driving residents to grocery stores and doctors' appointments (Tr. 39).  Between 2004 and 2006, she worked for an assisted elderly care company, distributing medication, driving clients to doctor's appointments, and housecleaning (Tr. 40).  In 2008, she was self-employed as a daycare worker (Tr. 41).  She had not worked since 2008 due to intermittent pain and medication side effects (Tr. 41).

In response to the ALJ's observation that a previous ALJ had found the presence of MS in 2009 (but found that the condition was not disabling) Plaintiff stated that her condition had worsened since then (Tr. 42-43).  Prior to 2009, she experienced only left side symptoms but now experienced symptoms on both sides (Tr. 43).  MS caused leg and knee pain; upper extremity numbness; back spasms; hand and foot swelling; neck pain; and the loss of vision in first the right, then left eye (Tr. 43-44).   The vision problems were treated successfully with prednisone (Tr. 44).  She experienced headaches approximately three times a week and required the use of an inhaler for asthma (Tr. 45).  Plaintiff saw her neurologist once a year, acknowledging that the condition of MS was stable (Tr. 46).  She had attended therapy sessions two to three times a month since November, 2010 and also received psychotropic medication (Tr. 45).  She currently took a muscle relaxer, Avanex, Abilify,Trazodone, and Pristiq (Tr. 48).

She typically arose at 6:00 a.m. but required a nap by 9:30 a.m. (Tr. 50). She did not experience problems dressing herself, but required assistance shopping for her children and helping them with their homework (Tr. 51). Her children cleaned and helped her wash her own clothes (Tr. 52). She did not use a computer (Tr. 52). She held a valid driver's license (Tr. 54). Her shopping trips were limited to a "corner store down the street" (Tr. 54). She spent most of her day watching television (Tr. 54). She did not experience problems getting along with family, friends, or neighbors (Tr. 54).

In response to questioning by her attorney, Plaintiff estimated that as a result of MS, she experienced two "bad" days each week during which time she was bedridden due to lower extremity and hand pain (Tr. 55-56). During such times, she experienced problems gripping (Tr. 56). She testified that bouts of depression were characterized by crying jags, anxiety, and problems focusing (Tr. 58-59). She reported limited improvement from the use of psychotropic drugs and therapy (Tr. 60).

### B.   Medical Evidence

#### 1. Treating Sources

April, 2000 treating records by neurologist Henry Hagenstein, D.O., noting that "several years" had passed since Plaintiff's last visit, state that Plaintiff reported bilateral weakness but normal walking and balancing (Tr. 215). An October, 2002 MRI of the brain showed new lesions consistent with chronic MS (Tr. 219). In February, 2005, Plaintiff reported marijuana use every other day (Tr. 226). Plaintiff was successfully treating for

-4-

conjunctivitis in September, 2005 (Tr. 225). In March, 2006, Steven R. Shapiro, D.O. was unable to confirm Plaintiff's report of an antalgic gait (Tr. 218). The following month, Plaintiff reported left side weakness (Tr. 223). In March, 2007, Plaintiff reported depression following the death of her "significant other" (Tr. 248).

Dr. Hagenstein's June, 2008 notes state that Plaintiff reported "no major flare ups of MS in several years," but complained of fatigue and intermittent pain (Tr. 276). He noted mild paresis of the left arm and leg (Tr. 278). In August, 2008, Plaintiff reported good results from physical therapy, but the following month, stated that her progress had "peaked" (Tr. 242). Therapy discharge records from the same month state that Plaintiff had voluntarily discontinued therapy "secondary to a disability filing dispute" (Tr. 272). The discharge records state that Plaintiff's account of her own condition contained significant inconsistencies and "embellishments" (Tr. 272). Dr. Shapiro's February, 2009 notes state that Plaintiff had been unable to attend physical therapy due to "transportation issues" (Tr. 241). The same month, Dr. Hagenstein, noting Plaintiff's reports of muscle pain, opined that Plaintiff had not "had a significant or major flare up" of MS (Tr. 271).

In May, 2009, Dr. Hagenstein noted Plaintiff's report of fatigue, weakness, and pain, but noted no muscle atrophy and 5/5 strength in all extremities (Tr. 272). The same month, Dr. Shapiro characterized hand and foot swelling as premenstrual symptoms (Tr. 285). In June, 2009, Dr. Shapiro noted Plaintiff's complaints of weakness and fatigue (Tr. 319). In March, 2010, Dr. Shapiro opined that Plaintiff's reported back problems were "set[] off" by

incorrect posture (Tr. 295).   Physical therapy notes from the same month state that therapy goals were partially met (Tr. 317).

In June, 2010, Dr. Hagenstein noted Plaintiff's reports of generalized fatigue, "poor physical endurance," and memory problems (Tr. 287, 313).   A mental status examination was unremarkable (Tr. 314).   The same month, he composed an opinion letter, stating that due to muscle weakness, fatigue, visual blurring, and "episodic staggering gait and pain," Plaintiff was incapable of gainful employment (Tr. 292).   The same month, Dr. Shapiro noted Dr. Hagenstein's recent finding that Plaintiff's MS was "in remission," but that she experienced fatigue, pain, and cognitive impairment" (Tr. 294).     In November, 2010, Pamela Griffin, M.A. performed a psychological intake examination, finding that Plaintiff experienced depression (Tr. 338).

In January, 2011, physical therapy discharge notes state that Plaintiff made multiple inconsistent statements regarding the level and nature of her pain (Tr. 343).   The discharge notes state further that she attended four sessions, canceled two, and failed to show for two, telling her therapist that she attended therapy because "[she was] told to" (Tr. 343, 357).   In April, 2011, Dr. Shapiro noted that Plaintiff reported an improved mood after taking psychotropic medication and attending therapy (Tr. 356).   In June, 2011, Dr. Hagenstein remarked that symptoms of MS had remained "relatively stable" (Tr. 288, 363).   She exhibited a normal affect (Tr. 289, 364).   Plaintiff appeared fully oriented with a full range of motion (Tr. 289).   She demonstrated 4/5 muscle strength (Tr. 289).

-6-

In September, 2011, Griffin completed a Mental Residual Functional Capacity Questionnaire, assigning Plaintiff a GAF of 45[2] (Tr. 331).  She found Plaintiff was either "unable to meet competitive standards" or had "no useful ability to function"  in the following categories: maintaining attention for extended periods, maintaining regular attendance, working without supervision, working in coordination with others, working without psychologically based interruption, accepting criticism, getting along with coworkers, responding to workplace changes, dealing with stress, setting realistic goals and understanding, remembering, and carrying out detailed instructions (Tr. 333).  She also found such limitations in interacting appropriately with the general public, traveling to unfamiliar places, or using public transportation (Tr. 334).  She found that Plaintiff would be expected to be absent more than four days each month (Tr. 334).  In October, 2011, Dr. Hagenstein completed a Residual Functional Capacity Assessment, stating that Plaintiff was incapable of low stress jobs; sitting for more than two hours; standing for more than five minutes; or walking for more than two minutes (Tr. 368).   He found that Plaintiff could lift "less than 10 pounds" on a "rare" basis (Tr. 369).

## 2. Consultive and Non-Examining Sources

In January, 2007, Abdullah Raffee, M.D. performed a consultative physical

---

[2]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.  *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 34 ("*DSM-IV-TR* ")(4th ed. 2000).

examination on behalf of the SSA (Tr. 233-238).    He observed no difficulty with manipulative or exertional functions, but found that Plaintiff's ability to stoop, carry, push, and pull was limited (Tr. 234).  He found that Plaintiff did not require the use of a cane (Tr. 235).   She exhibited a full range of motion and normal reflexes but exhibited slightly less than full muscle strength in the upper and lower extremities (Tr. 238).

In August, 2010, Matthew P. Dickson, Ph.D. performed a one-time consultative examination on behalf of the SSA, noting Plaintiff's complaints of anxiety, depression, weakness, incoherence, and crying jags (Tr. 323).  She denied psychological treatment (Tr. 323).  She stated that her household chores were limited to making her bed or folding towels (Tr. 323).  She reported that she was able to drive short distances and keep appointments (Tr. 324).  Dr. Dickson noted that Plaintiff's mental activity was "spontaneous and organized" (Tr. 324).  He did not observe signs of anxiety (Tr. 325).  Dr. Dickson opined that Plaintiff's "ability to adapt to change and stress in the workplace" was "moderately impaired" (Tr. 325). Dr. Dickson assigned Plaintiff a GAF of 57,[3] finding that Plaintiff was capable of handling her own benefit funds (Tr. 326).   The same month, Ashok Kaul, M.D. performed a Psychiatric Review Technique, finding that as a result of affective disorders, Plaintiff experienced mild restriction in daily living and social functioning and moderate deficiencies in concentration, persistence, or pace (Tr. 92).

---

[3]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 34 ("*DSM-IV-TR*" )(4th ed.2000).

-8-

### 3.  Material Submitted After the October 21, 2011 Administrative Opinion

In September, 2012, Dr. Hagenstein composed an opinion letter in support of the disability claim, stating that Plaintiff was disabled as a result of "multiple [MS] flare ups through the years" (Tr. 373).  He stated that her symptoms included muscle weakness, fatigue, visual blurring, staggering, and pain (Tr. 372).

### C.  Vocational Expert Testimony

VE Timothy Shaner classified Plaintiff's former work as a child care provider, home attendant, and shuttle driver as semiskilled and exertionally medium and work as a house keeper and cashier, unskilled/light[4] (Tr. 62).  He testified that his findings were consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 62).  The ALJ then posed the following hypothetical question to the VE, taking into account Plaintiff's age, education, and work history:

> [T]he individual has the residual functional capacity to perform light exertion work activities . . . except that the individual would require a sit/stand option in a potential work setting.  Now, could such an individual perform any of [Plaintiff's] past work (Tr. 63)?

The VE stated that the above limitations would preclude the individual from

---

[4]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;"  *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

performing Plaintiff's past relevant work but allow for the light/unskilled work of an assembler (4,500 positions in the State of Michigan); inspector (1,600); and general office clerk (4,000) (Tr. 63).   The VE found that if the hypothetical limitations also included "the ability to alternate between sitting and standing as necessary;" limiting the individual to occasional climbing stairs, balancing, walking, stopping, kneeling, crouching, and crawling; avoiding temperature extremes and hazards; and limiting the individual to "simple, routine, and repetitive work activities in a stable work environment," the above-stated job numbers would remain unchanged (Tr. 64-65).

In response to questioning by Plaintiff's attorney, the VE stated that if the same individual were limited to five pound lifitng; the inability to stand or walk for even two hours a day; limitations in handling and gripping; and the need for unscheduled breaks and more than four days of absences each month due to medication side effects and pain, the individual would be unable to perform any work (Tr. 65).   The VE stated that if the same individual required special supervision and was unable to complete a workday without interruption from psychologically based symptoms, all work would be precluded (Tr. 66).

### D.  The ALJ's Decision

Citing Plaintiff's medical records post-dating the September 4, 2009 decision, the ALJ found that Plaintiff experienced the severe impairments of MS and depression but that neither condition met or medically equaled an impairment found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 17-18).    He found that Plaintiff experienced mild

deficiencies in activities of daily living and social functioning and moderate limitation in

concentration, persistence, or pace (Tr. 19-20).  The ALJ found that Plaintiff retained the

Residual Functional Capacity ("RFC") for light work with the following limitations:

> [C]laimant should have the option to alternate between sitting and standing;
> the claimant is limited to occasional climbing of stairs, balancing, stooping,
> kneeling, crouching and crawling; the claimant should avoid extremes of cold
> and heat; the claimant should avoid exposure to workplace hazards such as
> unprotected heights or moving industrial machinery; and the claimant is
> mentally limited to simple, routine and repetitive work activities performed in
> a stable work environment (Tr. 20).

The ALJ noted that the above RFC was more restrictive than the September 4, 2009

determination, noting that the current RFC had been "tailored" to accommodate Plaintiff's

allegations of depression (Tr. 21).  Citing the VE's job findings, he found that Plaintiff was

unable to perform any of her former jobs but could work as an assembler, general office

clerk, or an inspector (Tr. 25).

Despite the more restrictive RFC, the ALJ rejected a portion of Plaintiff's allegations

of limitation (Tr. 21).  He noted that neurological exams showed only mild loss of muscle

strength (Tr. 22).  He cited observations of a normal gait and a "generally full" range of

motion (Tr. 22).  He found that vision problems in right eye were "transient" (Tr. 22).  He

noted that Plaintiff's claims of hand and foot swelling were unsupported by any treating

observations (Tr. 22).  He found that Plaintiff's claims that she was bedridden or required

frequent naps were "inconsistent" with the treating and consultative records (Tr. 22).   He

rejected Dr. Hagenstein's October, 2011 assessment on the basis that it was inconsistent with

the neurologist's own treating records (Tr. 23).   Likewise, he rejected Griffin's finding of extreme mental limitations, noting that those findings stood at odds with Plaintiff's ability to drive, handle her own finances, and meet her own personal needs (Tr. 23).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less than a preponderance.   It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*   800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### The Step Three Determination

Plaintiff argues that at Step Three, the ALJ erred by failing to explain his finding that her condition did not medically equal Listing 11.09 (Multiple Sclerosis).  *Plaintiff's Brief* at 8-11, *Docket #14.*  She contends that her condition meets or equals Listing 11.09C.  *Id.* at 10-11.   She makes a secondary argument that the ALJ impermissibly relied on a "single

decision-maker" ("SDM") in making his finding that that Listing 11.09 was neither met nor equaled. *Id.* at 8-9.

**A. Listing 11.09**

Listing 20 C.F.R. part 404, Subpart P, Appendix 1, § 11.09 (Multiple Sclerosis) states in pertinent part:

> A. Disorganization of motor function as described in 11.04B; or
>
> B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or
>
> C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

Establishing disability at 11.09C requires as follows: "(1) documenting a diagnosis of multiple sclerosis, (2) obtaining a description of fatigue considered to be characteristic of multiple sclerosis, and (3) . . . evidence that the system has actually become fatigued. The evaluation of the magnitude of the impairment must consider the degree of exercise and the severity of the resulting muscle weakness." *Id.* at § 11.00E.

Plaintiff points to the text of the administrative opinion stating that her "MS fails to meet the requirements of list section 11.09," rather than "meet or *medically equal*" (Tr. 18). However, this statement is located directly under the heading stating that Plaintiff did not experience *any* "impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments . . . (Tr. 18). The omission from the text, with

-14-

nothing more, does not constitute reversible error.

Moreover, in making the Step Three finding that Plaintiff did not meet or equal Listing 11.09, the ALJ observed that Plaintiff had "not exhibited serious deficits in unassisted gait or manipulative capabilities under clinical examination" (Tr. 18).  He noted further that her "alleged visual difficulties" were "transient and poorly documented" (Tr. 18).  He observed that "deficits in concentration and memory," while alleged, had "not been noted to be of a serious degree under clinical examination" (Tr. 18).  He noted that under clinical conditions, she exhibited only "mild" (rather than significant) motor loss (Tr. 19).  The ALJ cited Dr. Hagenstein's June, 2011 statement that Plaintiff's MS had remained relatively stable and clinical findings of a full range of motion and 4/5 muscle strength (Tr. 288).  Other records from the relative period stand at odds with Plaintiff's claim of disability under Listing 11.09C.  In March, 2010, Dr. Shapiro opined that body aches were precipitated by bad posture rather than MS (Tr. 295).  The claims of MS-related symptomology are also undermined by January, 2011 therapy records suggesting that she exaggerated her symptoms and attended session for the sole purpose of establishing a record for the disability claim (Tr. 343).

**B. Equivalency**

Plaintiff argues more persuasively that the articulation error is accompanied by a substantive error.  In this case, an SDM completed a pre-hearing review of the available source material in finding that Plaintiff did not meet or equal Listing 11.09 (Tr. 87-117).

Plaintiff contends that the ALJ erroneously relied solely on the SDM's report in making the Step Three determination that she did not medically *equal* Listing 11.09.

"The single decisionmaker model stems from 20 C.F.R. § § 404.1406(b)(2) and 404.906(b)(2) and these regulations provide for an experimental, stream-lined procedure that eliminated the reconsideration level of review and which allowed claims to go directly from the initial denial to ALJ hearing . . . 'allow[ing] the single decisionmaker to render the initial denial of benefits without documenting medical opinions from the state agency medical consultants.'" *Lindsey v. Commissioner of Social Sec.,* 2013 WL 6095545, *6 (E.D.Mich. November 20, 2013)(citing *Crooks v. Comm'r of Soc. Sec.,* 2013 WL 4502162, at *9 (E.D.Mich. Aug.22, 2013))(punctuation omitted).   In the ALJ's determination, "RFC forms completed by SDMs are 'not opinion evidence'" *Id.* (citing The Programs Operations Manual System ("POMS") DI § 24510.05)).   "'[U]nder the regulations and agency policy, SDM assessments have no place in an ALJ's disability determination.'" *Id.* (citing *White v. Comm'r of Soc. Sec.,* 2013 WL 4414727, *8 (E.D.Mich. Aug.14, 2013)).

The ALJ appears to not have *explicitly* relied on the SDM's findings on the issue of equivalency.   The ALJ did not cite the SDM findings in his Step Two and Three discussions (Tr. 17-19)  and in fact, took pains to state that the SDM did not constitute "opinion evidence" (Tr. 23).   Nonetheless, the fact that the ALJ did not cite the SDM findings is a distinction without a difference, given that the transcript does not contain opinion evidence on the issue of equivalency.   While the ALJ is not bound to adopt equivalency findings by

-16-

State agency medical consultative sources, "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight."   SSR 96-6p, 1996 WL 374180, *3; See also *Pizzo v. Commissioner of Social Sec.* 2014 WL 1030845, *19 (E.D.Mich. March 14, 2014)(relying on *Stratton v. Astrue,* ──F.Supp.2d ──, 2012 WL 1852084, *11–12 (D.N.H.  May 11, 2012))("While the ALJ did not rely on the opinion of the SDM, which would have been wholly improper, the lack of any medical opinion on the issue of equivalence is still an error requiring remand"); *Lindsey, supra,* at *7 ("even if [the ALJ] . . . did not rely on the SDM opinion, the lack of medical opinion evidence on the issue of equivalence alone requires remand").   As such, the case should be remanded "so the ALJ can obtain a qualified medical opinion on the issue of equivalence." *Lindsey,* at 7.[5]

─────────────────

[5]In finding that remand is appropriate on the issue of equivalency, I have also considered whether ALJ Dowd was bound by the September 4, 2009 findings. *See Drummond v. Commissioner of Social Security,* 126 F.3d 837 (6th Cir. 1997), which states that in the absence of new and material evidence postdating an earlier decision under the same Title, the later fact finder must adopt the previous RFC.  Administrative Ruling ("AR") 98-4, codifying *Drummond ,* provides as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in law, regulations, or rulings affecting the finding or method for arriving at the finding. AR 98-4(6).

### C.  Other Claims of Error

Plaintiff's additional arguments, assigning error to almost every aspect of the administrative opinion, are not well taken.

Notwithstanding the deference generally accorded a treating physician's opinion, the ALJ noted that Dr. Hagenstein's October, 2011 statement that Plaintiff was unable to perform even a limited range of sedentary work or perform unskilled jobs stood at odds with his own treating notes showing "no obvious gait disturbance, no serious clinical deficits in concentration or memory and only mild generalized weakness" (Tr. 23).  The ALJ cited Dr. Hagenstein's finding that the condition of MS was in remission and was "relatively stable throughout the period under consideration" (Tr. 23).  My own review of Dr. Hagenstein's treating notes suggest that findings such as muscle weakness, fatigue, visual blurring, and "episodic staggering gait and pain" were based on Plaintiff's subjective reports rather than objective testing (Tr. 287, 292, 313).  None of the other treating or consultative sources observed "staggering" or gait abnormalities requiring the use of an assistive device.  The

---

The prior findings are not included in the present transcript.  It is certain, however, that the earlier determination of non-disability would have  included a Step Three finding that Plaintiff did not meet or medically equal a listed impairment.  In the absence of new and material evidence, the ALJ would be bound by the earlier Step Three determination.  However, in regard to *Drummond,* ALJ Dowd stated only that he "considered" the prior findings, but "tailored" the RFC "to accommodate additional restrictions described in the current hearing record and considering the [Plaintiff's] depression" (Tr. 21).  ALJ Dowd appears to state that the newer records included "new and material" evidence as to both MS and depression.  At a minimum, the "tailored" RFC muddies the question of whether the ALJ adopted the early Step Three findings regarding MS.

ALJ's finding that Plaintiff's vision problems were "transient" is supported by the consultative examiner's finding that Plaintiff demonstrated satisfactory, corrected vision (Tr. 18, 237). Plaintiff's argument that the treating physician analysis contains error, reversible or otherwise, should be rejected. *Plaintiff's Brief* at 13-16.

Further, while the ALJ was not required to accord any deference to therapist Griffin's opinion, he thoroughly explained his reasons for discounting her September, 2011 opinion that Plaintiff was "unable to meet competitive standards" or had "no useful ability to function" (Tr. 23). The ALJ remarked that Plaintiff's ability to handle her own finances, self-administer medication, keep appointments, drive, and "find locations independently" stood at odds with Griffin's finding that she had "no useful ability to function" in sustaining a routine without supervision (Tr. 23, 333).

The ALJ noted that he based his finding of "mild" social limitations on the fact that Plaintiff did not exhibit deficiencies in social functioning in her work history or interaction with treating and consultative sources. Contrary to her allegations of moderate social limitation, *Plaintiff's Brief* at 12-13, substantial evidence supports the finding that the social limitation was mild. The ALJ did not err in rejecting Griffin's findings which included the statement that Plaintiff had "no useful ability to function" in interacting with coworkers and the public (Tr. 19, 334). I note that the paucity of treating records created between Griffin's November, 2010 intake assessment and the September, 2011 finding of extreme limitations also undermine the therapist's opinion.

Plaintiff's argument that the ALJ's impermissibly discounted her claims of mental and physical limitation, *Plaintiff's Brief* at 16-19, is also unavailing.  As noted by the  ALJ, she did not exhibit more than mild strength loss in clinical examinations (Tr. 22).  She did not show deficits in manipulation or ambulation (Tr. 22).  The ALJ's observation that the treating records did not support claims of hand and foot swelling due to MS is supported by Dr. Shapiro's finding that the swelling was due to premenstrual symptoms rather than a neurological condition (Tr. 285).

As to concentrational limitations, the ALJ noted that Plaintiff was able to engage in "moderately complex mental tasks such as handling her own finances and medication, supervising her children, driving, and playing cards with family members (Tr. 22).  Her contention that "three rounds of physical therapy" supported a disability finding, *Plaintiff's Brief* at 17, is particularly specious, given that in two of the three rounds, she was discharged after therapists noted inconsistencies in reports of pain,  "embellishment" of symptoms, and suggestions that she participated in therapy only for the purpose of procuring disability benefits (Tr. 272, 343).

Finally, Plaintiff argues that the modifiers of "simple, routine, and repetitive work," found both in the RFC (Tr. 20) and hypothetical question to the VE (Tr. 64), do not account for her moderate limitations in concentration, persistence, or pace ("CPP") as found in the administrative opinion. *Plaintiff's Brief* at 11-12, 19-20.  She relies on the well established premise that vocational testimony given in response to a hypothetical question constitutes

-20-

substantial evidence only if it accurately portrays the individual's physical and mental impairments. *Varley v. Commissioner of Health and Human Services*, 820 F.2d 777, 779 (6th Cir.1987). She cites *Ealy v. Commissioner*, 594 F.3d 504, 516 (6th Cir.2010) in which the Court found that the hypothetical limitations of "simple repetitive tasks" were insufficient to account for the claimant's moderate deficiencies in CPP.

However, *Ealy* does not hold that the terms "simple, repetitive," "routine" or similar modifiers are intrinsically inadequate to address moderate CPP deficiencies. Rather, the *Ealy* Court determined that the hypothetical limitations of "simple, repetitive" (drawn from a non-examining medical source conclusion) impermissibly truncated the same source's conclusion that the claimant should be limited to "simple repetitive tasks to '[two-hour] segments over an eight-hour day where speed was not critical.' " *Id.*, 594 F.3d at 516. The position that "simple and repetitive" or synonymous terms are always insufficient to address moderate CPP deficiencies (even where the record does not support more stringent limitations) reflects an erroneous reading of *Ealy.* To the contrary, the evidence of record and the ALJ's opinion must be considered in their entirety in determining whether the hypothetical limitations adequately describe the claimant's limitations. *Schalk v. Commissioner of Social Sec.*, 2011 WL 4406824, *11 (E.D.Mich. August 30, 2011) ("no bright-line rule" that moderate concentrational deficiencies require the inclusion of certain hypothetical limitations) (citing *Hess v. Comm'r of Soc. Sec.*, 2008 WL 2478325, *7 (E.D.Mich. June 16, 2008)).

-21-

Here, the hypothetical modifiers of "simple, routine, and repetitive" sufficiently accounted for Plaintiff's moderate deficiencies in CPP.  Plaintiff bases this argument on the premise that the mental limitations found in Griffin's assessment and her own allegations of impairment ought to have been adopted.  However, the ALJ thoroughly explained his reasons for rejecting Griffin's opinion and Plaintiff' testimony.  Having done so, he was not obliged to incorporate the rejected complaints of either physical or mental limitations into the hypothetical.  *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994)(*citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987).

Further, because the ALJ's inclusion of certain hypothetical limitations and the omission of others is well explained and supported, substantial evidence supports the VE's findings that she could work as an assembler, inspector, or general office clerk.  Plaintiff, citing *Ealy,* notes that moderate deficiencies in CPP could impact jobs requiring the meeting of quotas.   Assuming for the sake of argument that Plaintiff is unable to perform quota driven positions, the job of general office clerk (as cited by the VE) would involve neither quotas nor high speed production work (Tr. 63).   Even excluding the inspector and assembler positions cited by the VE, the 4,000 office clerk positions easily constitute a "significant" number of the jobs required to support the Step Five determination.  *Martin v. Commissioner of Social Security*, 170 Fed.Appx. 369, 375, 2006 WL 509393, *5 (6th Cir. March 1, 2006) (870 jobs in the claimant's geographic region a significant number).

-22-

In closing, I note that for the reasons set forth in section **A.**, a remand is required.  Still, because the present transcript shows far less than an "overwhelming" case for disability, the the Plaintiff is not automatically entitled to an award of benefits. *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171 (6th Cir.1994).  Accordingly, the case should be remanded to the administrative level for the purpose of obtaining a qualified medical opinion on the issue of equivalence.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's motion for summary judgment be DENIED and that Plaintiff's motion for summary judgment be GRANTED to the extent that the case is remanded to the administrative level for further proceedings consistent with this Report and Recommendation..

Any objections to this  Report and Recommendation must be filed  within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v.*

*Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: May 27, 2014

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on May 27, 2014, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen

-24-